## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

AAROW ELECTRICAL SOLUTIONS,    *

     **Plaintiff,**      *

     **v.**      *          **CIVIL NO. JKB-22-2363**

TRICORE SYSTEMS, LLC et al.,    *

     **Defendants.**      *

   *    *    *    *    *    *    *    *    *    *    *    *

### MEMORANDUM

Plaintiff Aarow Electrical Solutions, LLC ("Aarow") filed suit against National Technology Integrators, LLC ("NTI") and Tricore Systems, LLC ("Tricore") (together, the "Corporate Defendants"), and Ralph David Hummer, Anthony Reyes, Candace Santos, Jonathon Steele, John Taylor, Chad Tippett, Nathan Velozo, Michael Gregory Wilson, and David Paul Taylor (collectively, the "Individual Defendants"). (*See generally* Am. Compl., ECF No. 64.) Most of the Individual Defendants previously worked for Aarow and now work for Tricore: Hummer, Reyes, Santos, Steele, John Taylor, Tippett, and Velozo (collectively, the "Former Employees"). (*Id.* ¶ 37.) Wilson is a part-owner and president of NTI and David Taylor is a part-owner of NTI and Tricore. (*Id.* ¶¶ 10–11.)

Pending before the Court are: the Corporate Defendants' Motion to Certify (ECF No. 68), which will be denied; the Corporate Defendants' Motion to Dismiss (ECF No. 69), which will be granted in part and denied in part; the Individual Defendants' Motion to Join the two Motions filed by the Corporate Defendants (ECF No. 70), which will be granted insofar as it seeks to join the two Motions; David Taylor's Motion to Dismiss (ECF No. 71), which will be denied; and Aarow's Motion for Additional Redactions or Sealing (ECF No. 48), which will be granted.

1

## I.  Factual Background

In short, Aarow alleges that the Defendants used various means—including misappropriating trade secret and confidential information and interfering with client contracts—to effectively steal a portion of its business.

Aarow is a "full-service electrical contractor" which "means that Aarow works with low voltage lighting, power, fire alarms, and systems and medium voltage power." (Am. Compl. ¶ 17.) Tricore, prior to the events at issue, "had never performed any electrical work and instead limited its business to low-voltage work." (*Id.* ¶ 43.) Tricore's work was different from Aarow's in that "Tricore only worked a low-voltage in A/V, communications, and security[.]" (*Id.*) NTI likewise performed low-voltage work. (*Id.* ¶ 44.) NTI and Tricore are different entities, but "maintain a close business relationship." (*Id.*)

Aarow "possesses trade secret information from which it derives economic value" and "possesses non-trade secret confidential information as part of its existence as an operating company." (*Id.* ¶¶ 18–19.) . Aarow alleges that its work is "highly competitive" and that "[t]he way contractors develop their bid proposals, pricing strategies, and construction strategies is crucial to developing business, and if accessed by competitors, would allow competitors to undercut pricing and gain an easy economic advantage." (*Id.* ¶¶ 21–22.)

Aarow alleges that it keeps its bidding, budgeting, and certain other information and documents confidential. (*Id.* ¶¶ 23–25.) For instance, Aarow alleges that it "password-protect[s] computers and online accounts, us[es] a private server to store information, [and] operat[es] from a secure facility." (*Id.* ¶ 32.) It also "provided password-protected laptops for each employee to work remotely to prevent unnecessary overlap with employees' personal electronics." (*Id.* ¶ 33.) In addition, Aarow includes a confidentiality statement on client proposals indicating that such

proposal is "considered private and confidential" and that "[s]haring of Aarow Pricing and SOW is not allowed without specific written authorization[.]" (*Id.* ¶ 34.) Further, Aarow's Employee Handbook—which each of the Former Employees signed—provides that the "[u]nauthorized disclosure of business 'secrets' or confidential information" could result in "disciplinary action, up to and including termination of employment." (*Id.* ¶¶ 37, 39.)

Beginning in late 2021 through August 2022, the Former Employees left Aarow to work for Tricore: Hummer was the first to leave Aarow in late 2021 and became Tricore's president, and John Taylor was the last to leave Aarow on August 23, 2022 and became a Tricore assistant project manager. (*Id.* ¶¶ 48, 89.) Aarow alleges that, during this exodus, the Defendants misappropriated Aarow's business in various ways. Aarow's allegations against the Former Employees can be summed up as follows:

> While employees of Aarow, the Former Employees systematically paved the way for their future employer, Tricore, by among other things, forwarding competitive pricing materials to Tricore, delaying progress on current Aarow projects, and performing work on behalf of Tricore during working hours as Aarow employees.

(*Id.* ¶ 67.) Below are examples of such allegations.

In January 2022, when Steele was still employed at Aarow, he created a spreadsheet "detail[ing] a five-year plan to open up a Tricore electrical division with a year one revenue of $6,850,000. The only way to generate such revenue in the first year of a new business is to bring on pre-existing work." (*Id.* ¶ 51.) Aarow alleges that the spreadsheet contained "specific references to Tricore and / or NTI weighing in on the cost projections"; that David Taylor (part owner of NTI and Tricore) edited the spreadsheet; and that Steele's Aarow laptop files show that he was corresponding with David Taylor in March of 2022. (*Id.* ¶¶ 52–53.) Steele also "uploaded and sent numerous files or emails from his Aarow laptop to his personal Gmail account with titles matching projects that Aarow was working, had bid, or was in the process of bidding" and that

"[m]any of those projects" were "ultimately [] worked by Tricore[.]"  (*Id.* ¶ 69.)  Steele received an offer of employment from Tricore in April 2022 and became their Chief Operating Officer ("COO").  (*Id.* ¶ 64.)  Steele allegedly deleted all sent emails from his Aarow email address for the two years prior to leaving Aarow.  (*Id.* ¶ 75.)

Aarow also alleges that, on May 5, 2022, John Taylor (then an Aarow employee) downloaded data from Aarow's "Accubid" database, which Aarow uses to track and prepare bids.  (*Id.* ¶ 72.)  The data included information "for numerous projects, includ[ing] names, dates of bids, the cost of bids, the status of the bid, and the anticipated hours to complete the bidded work."  (*Id.*)  He then created a spreadsheet with this information.  (*Id.*)  Aarow alleges that it never downloads Accubid data in this manner, and that the spreadsheet created by John Taylor would be a "surplus" which "clearly indicates it was intended for use outside of Aarow[.]"  (*Id.*)  John Taylor ultimately left Aarow for Tricore in August 2022.  (*Id.* ¶ 89.)  He allegedly deleted all documents from October 21, 2020 through his last day at Aarow from his "Documents" folder.  (*Id.* ¶ 77.)

Aarow alleges that the Defendants misappropriated or otherwise interfered with various specific projects.  (*Id.* ¶¶ 95–96.)  For instance, on June 21, 2022, John Taylor (then an Aarow employee) submitted a proposal on behalf of Aarow for a Kaiser Permanente "Ashburn Project."  (*Id.* ¶ 97.)  Two weeks later, Steele (then the COO of Tricore) submitted a proposal for the Ashburn Project.  (*Id.* ¶ 101.)  Aarow only learned that Tricore also bid on the project when "Kaiser Permanente apparently attempted to email Tony Reyes (then a Tricore employee) on August 9, 2022 about the KP Ashburn Project, but instead responded to Tony Reyes's Aarow email address."  (*Id.* ¶ 102.)  Tricore's proposal had "the same sections as Aarow's proposal" and "each of those sections [was] letter-for-letter identical to the Aarow proposal."  (*Id.* ¶ 103.)  A nearly identical chain of events occurred with respect to a Kaiser Permanente "Manassas Nurse Call Project."  (*Id.*

4

¶ 105–11.) Aarow makes allegations regarding several other projects, including that Reyes "met with [client] Kaiser Permanente on Tricore's behalf, where he convinced Kaiser Permanente to breach its contract with Aarow on at least two construction projects" and to move the work over to Tricore. (*Id.* ¶ 91; *see also* ¶¶ 112–19.)

The Court will provide additional details as necessary below. Aarow brings the following claims: misappropriation of trade secrets in violation of the Defend Trade Secrets Act ("DTSA") against Tricore and the Former Employees (Count I); misappropriation of trade secrets in violation of the Maryland Uniform Trade Secrets Act ("MUTSA") against Tricore and the Former Employees (Count II); aiding and abetting misappropriation of trade secrets in violation of the DTSA against Wilson and NTI (Count III); aiding and abetting misappropriation of trade secrets in violation of the MUTSA against Wilson and NTI (Count IV); breach of fiduciary duties against the Former Employees (Count V); aiding and abetting Former Employees' breaches of fiduciary duty against David Taylor, Wilson, and NTI (Count VI); unfair competition against all Defendants (Count VII); civil conspiracy against all Defendants (Count VIII); and tortious interference with contract against Tricore and the Former Employees (Count IX).

## II.   *Motion to Certify*

The Corporate Defendants seek to certify the following question to the Supreme Court of Maryland: "Does the express preemption provision of [the MUTSA] preempt common law claims grounded on misappropriation of both trade secrets and confidential and proprietary information?" (ECF No. 68 at 1.) The Court will deny this Motion. The Individual Defendants filed a Motion to Join the Motion to Certify. (ECF No. 70.) The Motion to Join will be granted.

### *A.  Legal Standard*

The Supreme Court of Maryland may answer a question of law certified to it by a federal

5

court if: (1) "the answer may be determinative of an issue in pending litigation in the certifying court;" and (2) "there is no controlling appellate decision, constitutional provision, or statute." Md. Code Ann., Cts. & Jud. Proc. § 12-603.

"[I]t is well established that the decision to certify a question to the [Supreme Court of Maryland] is not obligatory and rests in the sound discretion of the federal court." *Marshall v. James B. Nutter & Co.*, Civ. No. RDB-10-3596, 2013 WL 3353475, at *7 (D. Md. July 2, 2013), *aff'd*, 758 F.3d 537 (4th Cir. 2014) (citation and internal quotation omitted). "Just because a question of law qualifies for certification . . . does not mean the Court *must* certify it." *Doe v. Chesapeake Med. Sols., LLC*, Civ. No. SAG-19-2670, 2020 WL 917061, at *4 (D. Md. Feb. 26, 2020) (emphasis in original). Certification is not necessary where the federal court can "render a reasoned and principled conclusion." *Simpson v. Duke Energy Corp.*, 191 F.3d 448 (Table) (4th Cir. 1999) (concluding that the district court below did not err in denying certification "[b]ecause there exists sufficient sources of [state] law for us to render a reasoned and principled conclusion"); *see also Antonio v. SSA Sec., Inc.*, 749 F.3d 227, 234 (4th Cir. 2014) (explaining that, even where "Maryland's courts have not interpreted the statute[,]" the court can "look first to its plain meaning to determine whether [it] can deduce [the statute's] import without certifying a question").

### B. Analysis

Although the question Defendants pose may qualify for certification—it is a question that may be determinative of an issue in this case and it has not been answered by the Maryland Supreme Court—the Court will decline to certify it.

The MUTSA contains an express preemption provision, which provides that the statute "displaces conflicting tort, restitutionary, and other law of this State providing civil remedies for misappropriation of a *trade secret*." Md. Code Ann., Com. Law § 11-1207(a) (emphasis added).

6

This preemption provision provides exceptions, including "[o]ther civil remedies that are not based upon misappropriation of a *trade secret*." Md. Code Ann., Com. Law § 11-1207(b)(1)(ii) (emphasis added). Thus, by the plain language of the statute, the preemption provision applies to trade secrets and not to non-trade secret confidential information. Indeed, this Court has so found on multiple occasions.

This Court has previously explained that—although the highest court in Maryland has not yet addressed the scope of MUTSA preemption—"courts in the District of Maryland, have found that the [MUTSA] preempts only claims based on misappropriation of trade secrets, not other confidential information." *Hardwire, LLC v. Ebaugh*, Civ. No. JKB-20-0304, 2020 WL 5077469, at *4 (D. Md. Aug. 27, 2020); *see also ComRent Int'l, LLC v. Thomson*, Civ. No. RDB-20-3757, 2021 WL 1733471, at *6 (D. Md. May 3, 2021) (concluding that "claims for misappropriation of trade secrets that are *also* premised on 'other confidential and proprietary information' are not entirely preempted by MUTSA" (emphasis in original)); *Brightview Grp., LP v. Teeters*, Civ. No. SAG-19-2774, 2021 WL 1238501, at *21 (D. Md. Mar. 29, 2021) (finding that a "claim is not entirely preempted by the MUTSA, because it is also based on a conspiracy to wrongly acquire and use [the plaintiff's] non-trade secret confidential and proprietary information"); *Structural Pres. Sys., LLC v. Andrews*, Civ. No. MJG-12-1850, 2013 WL 3820023, at *5 (D. Md. July 23, 2013) ("Count I includes claims based on Proprietary Information that is not a MUTSA trade secret. Hence, there are at least some claims in Count I that are not preempted by the MUTSA.").

This interpretation is in line with dicta from Maryland's intermediate appellate court. That court has explained that "[s]ection 11–1207 provides, with exceptions, that the MUTSA constitutes the exclusive remedy for civil claims based on misappropriation of *trade secrets*. Thus, a claim for usurpation of a corporate opportunity, if based *solely* on misappropriation of a *trade secret*,

7

cannot survive once a remedy under the MUTSA is obtained." *Bond v. Polycycle, Inc.*, 732 A.2d 970, 976 n.2 (Md. Ct. Spec. App. 1999) (emphasis added). Courts in this district have relied on this language in concluding that civil claims based on non-trade secret information are not preempted by MUTSA's preemption provision. *See, e.g.*, *Hardwire*, 2020 WL 5077469, at *5; *Equity Prime Mortg., LLC v. 1st Fin., Inc.*, Civ. No. GLR-17-3754, 2019 WL 859135, at *8 (D. Md. Feb. 22, 2019); *Philips N. Am. LLC v. Hayes*, Civ. No. ELH-20-1409, 2020 WL 5407796, at *17 (D. Md. Sept. 9, 2020); *Structural Pres. Sys., LLC*, 2013 WL 3820023, at.*5.

The Court is not persuaded by Defendants' citations to cases that they claim support their expansive view of MUTSA preemption. For instance, Defendants argue that "the Maryland intermediate appellate court has suggested that it may take a broad view of MUTSA preemption." (ECF No. 68-1 at 12 (citing *First Union Nat. Bank v. Steele Software Sys. Corp.*, 838 A.2d 404 (Md. Ct. Spec. App. 2003).) However, in that case, the court explained that the plaintiffs specifically disclaimed "any claim for misappropriation of *trade secrets*" and also specifically noted that it would not reach the question of whether the "fraud claim was improperly predicated on alleged theft of [] business methods and is therefore preempted by the Maryland Uniform Trade Secrets Act." *First Union Nat. Bank*, 838 A.2d at 409, 434 n.16. Defendants' citations to other Maryland state court cases do not persuade the Court otherwise.[1]

---

[1]   For instance, Defendants cite *Duty Free Americas, Inc. v. Legg Mason Wood Walker, Inc.*, No. 24-C-04-005696, 2005 WL 914395, at *1 (Md. Cir. Ct. Jan. 13, 2005) for the proposition that "[n]umerous Maryland state circuit court opinions reflect an expansive interpretation of the scope of the MUTSA preemption provision." However, the court in that case explained that "[i]t is clear that MUTSA preempts any other tort remedy involving *trade secrets*." *Duty Free Americas, Inc. v. Legg Mason Wood Walker, Inc.*, No. 24-C-04-005696, 2005 WL 914395, at *2 (Md. Cir. Ct. Jan. 13, 2005). The court explained that the plaintiff's claim included "a claim for conversion of *trade secrets* that would be preempted by MUTSA" and went on to dismiss the conversion claim for a different reason. *Id.* Further, in *Omni Direct, Inc. v. Creative Direct Response, Inc.*, No. 450343-V, 2018 WL 11354912, at *5 (Md. Cir. Ct. Dec. 18, 2018), the court explained that it would not allow the plaintiff to "hedge its bets" when "all of [its] common law claims are grounded in the same facts that support [its] trade secret claims." *Id.* at *5–6. The court explained that plaintiff "alleged that *all of the business information* misappropriated by [defendant] was *a trade secret*." *Id.* at *4 (emphasis added). Not so here, where Aarow makes various allegations relating to non-trade secret information.

Accordingly, the Corporate Defendants' Motion to Certify (ECF No. 68) will be denied.

### III.    *Motions to Dismiss*

Defendants have filed two motions to dismiss: the Corporate Defendants' Motion to Dismiss (ECF No. 69)—which the Individual Defendants seek to join in various parts (ECF No. 70)—and David Taylor's Motion to Dismiss (ECF No. 71).  For the reasons set forth below, the Corporate Defendants' Motion to Dismiss will be granted in part and denied in part, and David Taylor's Motion to Dismiss will be denied.  The Individual Defendants' Motion to Join will be granted insofar as it seeks to join the Corporate Defendants' Motion to Dismiss.

### A.  *Legal Standard*

. When considering a motion to dismiss pursuant to Rule 12(b)(6), the Court must "accept as true all well-pleaded allegations and view the complaint in the light most favorable to the plaintiff." *Venkatraman v. REI Sys., Inc.*, 417 F.3d 418, 420 (4th Cir. 2005).  To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal,* 446 U.S. at 662.  A "pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.' Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Id.* at 678 (alteration in original) (quoting *Twombly*, 550 U.S. at 555, 557).

### B.  *Corporate Defendants' Motion to Dismiss and Individual Defendants' Joinder*

The Corporate Defendants' Motion to Dismiss will be granted in part and denied in part. In particular, the Corporate Defendants' Motion to Dismiss will be granted insofar as it seeks the

9

dismissal of the common law claims to the extent those counts are based on trade secrets. The Corporate Defendants' Motion to Dismiss will otherwise be denied.

### 1. Preemption of Common Law Claims

The Corporate Defendants argue that the Court should "determine that Aarow's common law tort claims based on misappropriation of confidential and/or proprietary information are preempted by the MUTSA." (ECF No. 69-1 at 9.) They also argue that, "[a]t a minimum, Aarow's claims against Tricore (and, to the extent applicable, NTI) for unfair competition [(Count VII)], civil conspiracy [(Count VIII)], and tortious interference with contract [(Count IX)] are partially preempted by the MUTSA[,]" given that they are partially based on the misappropriation of trade secrets. (*Id.* at 7.) The Individual Defendants, in their Motion to Join, argue that "[f]or the reasons stated and fully-fledged out in the Memorandum, the MUTSA preempts the common law tort claims in Counts III–IX."[2] (ECF No. 70 at 1.)

As discussed above, the Court concludes that the MUTSA preempts common law claims relating to trade secrets and does not preempt claims relating to other non-trade secret confidential information. Further, Plaintiff is permitted, at this stage of the litigation, to plead in the alternative. *See Hardwire, LLC*, 2020 WL 5077469, at *4 ("Courts in this District have held that plaintiffs may plead in the alternative under the liberal federal pleading standards that misappropriated confidential information is not a trade secret, and as such, common law claims relating to such confidential information are not preempted by MUTSA."). Even Defendants appear to agree with this approach. (*See* ECF No. 69-1 at 8 (noting that "a plaintiff may plead trade secrets and confidential information in the alternative until the court makes such a determination").)

---

[2]    Those Counts are: aiding and abetting misappropriation of trade secrets in violation of the DTSA (Count III); aiding and abetting misappropriation of trade secrets in violation of the MUTSA (Count IV); breach of fiduciary duties (Count V); aiding and abetting breaches of fiduciary duty (Count VI); unfair competition (Count VII); civil conspiracy (Count VIII); and tortious interference with contract (Count IX).

In short, Aarow may pursue its trade secret claims under the MUTSA and the DTSA and its non-trade secret claims under Maryland common law. For example, in Count V alleging breach of fiduciary duty, Aarow alleges that "Former Employees breached their duties of loyalty, by knowingly misappropriating trade secret and/or confidential information belonging to Aarow, diverting business opportunities which rightfully belonged to Aarow, recruiting Aarow employees to leave Aarow for employment at Tricore, and using Aarow company time and funds to act directly adverse to Aarow, their employer." (Am. Compl. ¶ 143 at 7.)[3] The fiduciary duty claim based on misappropriation of a trade secret is preempted by the MUTSA, but the fiduciary duty claim based on other allegations is not.

Accordingly, Defendants' Motion to Dismiss will be granted insofar as it seeks to dismiss Counts V through IX of the Amended Complaint to the extent those counts are based on allegations relating to trade secrets. However, those Counts will not be dismissed to the extent they are based on other allegations.

The Individual Defendants also seek dismissal of Counts III and IV (which seek to bring claims of aiding and abetting violations of the DTSA and MUTSA) on the basis of preemption. However, because they rely on Corporate Defendants' Motion to Dismiss—which does not address these two claims on the basis of preemption—they do not explain how aiding and abetting violations of the MUTSA or DTSA are common law claims preempted by the MUTSA, nor do they cite any authority for that proposition. (*See* ECF No. 70 at 1.) Accordingly, those claims will not be dismissed.

---

[3]   The Court notes that there is a numbering error in the Amended Complaint. The Court therefore includes page numbers in addition to paragraph numbers for certain citations.

### 2. *MUTSA and DTSA Counts*

Aarow brings claims alleging the misappropriation of trade secrets in violation of the DTSA and the MUTSA against Tricore and the Former Employees (Count I and Count II). (Am. Compl. ¶¶ 131–147 at 31–34.) Defendants argue that the documents and information identified in Aarow's Amended Complaint "do not meet the statutory definition of a trade secret because they do not have independent economic value and Aarow did not take reasonable measures under the circumstances to maintain their secrecy." (ECF No. 69-1 at 11; ECF No. 70 (Individual Defendants' joinder in this argument).) This argument fails, and the Court will not dismiss the MUTSA and DTSA claims.

### a. *Definition of a Trade Secret*

Under both the MUTSA and DTSA, a plaintiff must show that the documents at issue are trade secrets and that the defendant misappropriated those trade secrets. *See* 18 U.S.C. § 1836(b)(1); Md. Code Ann., Com. Law § 11-1201–03. The DTSA and the MUTSA define a trade secret in "substantially the same manner." *Md. Physician's Edge, LLC v. Behram*, Civ. No. DKC-17-2756, 2019 WL 4573417, at *5 (D. Md. Sept. 20, 2019). Both statutes require that (1) the information derive economic value from being not readily ascertainable and (2) that the owner of the purported trade secret employ reasonable measures to keep the information secret.

The DTSA defines a trade secret to include "all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible[.]" 18 U.S.C. § 1839(3). Such information is a trade secret if (1) the owner of the purported trade secret takes "reasonable measures to keep such information secret," and (2) "the information derives independent economic

value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information." *Id.* § 1839(3)(A)–(B).

Under the MUTSA, a trade secret includes "information, including a formula, pattern, compilation, program, device, method, technique, or process[.]" Md. Code Ann., Com. Law § 11-1201(e). That information is a trade secret if it: "(1) [d]erives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and (2) [i]s the subject of efforts that are reasonable under the circumstances to maintain its secrecy." *Id.*

### b. *Aarow Sufficiently Alleged the Existence of a Trade Secret*

As noted, Defendants argue Aarow has not sufficiently alleged the existence of a trade secret because the Aarow has not sufficiently alleged independent economic value or reasonable measures to maintain secrecy. The Court finds that Aarow has sufficiently alleged that at least some of the information that it categorizes as trade secrets qualifies as such.

Aarow has sufficiently alleged that certain of its information derives economic value from not being readily ascertainable. Aarow has alleged that Defendants misappropriated, *inter alia,* bid and project information and that "Aarow's kind of electrical contracting work is highly competitive as this work is within a niche market and opportunities to gain work and clientele are very dependent on the growth and establishment of relationships with customers." (Am. Compl. ¶ 21.) In particular, Aarow alleges that:

> The way contractors develop their bid proposals, pricing strategies, and construction strategies is crucial to developing business, and if accessed by competitors, would allow competitors to undercut pricing and gain an easy economic advantage. In many instances, the same competitors are bidding for work with the same customers over and over, meaning that procuring Aarow's bidding documents or procedures would provide substantial economic value to a competitor

13

by being able to both undercut Aarow and utilize Aarow's unique bidding methodology to compete with Aarow.

(*Id.* ¶ 22.)

Therefore, having access to Aarow's bid and project information would allow Defendants to outbid Aarow and gain a competitive edge. "In a competition for sales, information about potential customers and their buying habits, a competitor's pricing, business strategies, and vendors is a windfall, granting the recipient a key to undercut the competition's pricing, outbid their vendor contracts, and attract their customers." *Albert S. Smyth Co. v. Motes*, Civ. No. CCB-17-677, 2018 WL 3635024, at \*4 (D. Md. July 31, 2018); *see also Hayes*, 2020 WL 5407796, at \*8 (D. Md. Sept. 9, 2020) ("Maryland courts have repeatedly found that business plans, pricing and cost information, and customers lists for companies operating in competitive sales industries derive independent economic value from their confidentiality."); *MCS Services, Inc. v. Jones*, Civ. No. WMN-10-1042, 2010 WL 3895380, at \*7 (finding customer lists have independent economic value where company exerted resources to create lists and competitors could use list to their advantage). Defendants' arguments to the contrary, at this stage of the litigation, are unavailing. Plaintiffs have sufficiently alleged that, at a minimum, its bidding and price information derives economic value from not being readily ascertainable.[4]

The Court finds that Aarow has also sufficiently alleged that it took reasonable measures to maintain the information's secrecy, as is required by the DTSA and MUTSA. Aarow alleges that it had password-protected computers and online accounts, used a private server, and operated from a secure facility. (Am. Compl. ¶ 32.) It also alleges that "[e]ach employee could access

---

[4]  Defendants are correct that there is certain information in the Amended Complaint that Aarow has not sufficiently alleged constitutes a trade secret. For instance, Aarow has not sufficiently alleged that the New Hire Packet derives economic value from its confidentiality. However, as discussed above, Aarow has sufficiently alleged that at least some of the information that it claims Defendants have misappropriated constitutes a trade secret. Therefore, the Court will not dismiss the Counts in the Amended Complaint predicated on violations of the MUTSA and DTSA.

confidential or trade secret materials from the Aarow database which was only accessible to Aarow employees" and that "Aarow provided password-protected laptops for each employee to work remotely to prevent unnecessary overlap with employees' personal electronics." (*Id.* ¶ 33.) Further, the Aarow Employee Handbook explained that "[u]nauthorized disclosure of business 'secrets' or confidential information" could result in disciplinary action, including termination. (*Id.* ¶ 37.) In addition, when Aarow submits a quote or proposal to a client, it includes the following language:

> This quote is an Aarow Electrical Solutions owned and produced document and is considered private and confidential. Modification or alteration is strictly prohibited. Sharing of Aarow Pricing and SOW is not allowed without specific written authorization from an Aarow Operating Partner.

(*Id.* ¶ 34.) Aarow explains that it "keeps all of the related information and documents confidential, including estimates, takeoffs, and vendor or subcontractor quotes confidential as well." (*Id.* ¶ 35.)

These steps are sufficient for purposes of maintaining secrecy under the MUTSA and DTSA. *See, e.g.*, *Phreesia, Inc. v. Certify Glob., Inc.*, Civ. No. DLB-21-678, 2022 WL 911207, at *12 (D. Md. Mar. 29, 2022) (finding that a plaintiff sufficiently alleged that it took reasonable measures to keep information secret where it "required its clients to sign confidentiality agreements, and it used remote servers and controlled access to the [its system] via encryption and password protection").

Defendants argue that Aarow's protection of its materials was insufficient. Defendants argue, for instance, that "a single general reference to generic secrets or confidential information, lacking specific reference to even arguably protected information or identifying annotations on such documents, fails to grant such materials legal protection." (ECF No. 69-1 at 15.) However, setting aside that Defendants are viewing this one allegation in isolation, "[t]here is nothing in either DTSA or MUTSA case law which suggests that marking something 'confidential' is an

15

irreducible requirement of finding an employer has taken reasonable measures to keep the alleged trade secrets secret." *Behram*, 2019 WL 4573417, at *8.

In short, because Aarow has sufficiently alleged that it took reasonable steps to protect the confidentiality of certain information and that the information derives value from its confidentiality, Aarow has sufficiently alleged the existence of trade secrets within the meaning of the DTSA and MUTSA.[5]

### 3. Conspiracy Claim

Aarow brought a conspiracy claim (Count VIII) against all Defendants, alleging that the Defendants "carried out their conspiracy by misappropriating Aarow's trade secrets and other confidential and proprietary information as well as conspiring with the Former Employees to breach their fiduciary duties." (Am. Compl. ¶ 162 at 42.) The Corporate Defendants argue that Aarow's conspiracy claim fails for four reasons: (1) Aarow's underlying tort claims fail; (2) Aarow fails to allege an overt act in furtherance of the conspiracy by the Corporate Defendants; (3) the *Copperweld* doctrine bars the claim; and (4) Aarow fails to sufficiently allege a conspiracy as to Wilson, David Taylor, and NTI. (ECF No. 69-1 at 18–21.) The Individual Defendants join in the first and third reasons advanced by NTI and Tricore. (ECF No. 70 at 1 ("Count VIII fails to state a claim for conspiracy under the *Copperweld* Doctrine and to the extent Aarow's other claims are unactionable").) It is not clear why the Individual Defendants did not join in the fourth argument, as such argument specifically references two of the Individual Defendants. This appears to be an oversight, and the Court will address the fourth argument as it pertains to Wilson and David Taylor.

---

[5]    The Court pauses to address Defendants' argument that Aarow is essentially attempting to circumvent its failure to obtain non-compete agreements with its Former Employees. (*See* ECF No. 69-1 at 17.) This argument misses the mark. The Court is mindful that Aarow has not alleged that the Former Employees were subject to such an agreement. However, the absence of a non-compete agreement does not give former employees license to misappropriate information. Of course, whether Defendants did indeed misappropriate trade secrets remains to be seen, but Defendants' suggestion that the absence of a non-compete agreement is somehow dispositive is misplaced.

### a. *Underlying Claims*

Defendants argue that "to the extent Aarow's underlying claims of trade secret misappropriation, unfair competition, and tortious interference must fail . . . so too must Aarow's conspiracy claim." (ECF No. 69-1 at 18; *see also* ECF No. 70 at 1). As discussed above, the Court will not dismiss Aarow's underlying common law claims on the basis of preemption (other than to the extent they raise claims relating to trade secrets) or Aarow's trade secret misappropriation claims on the basis that Aarow has not sufficiently alleged the existence of a trade secret. Therefore, this argument fails.

### b. *Overt Act and Unity of Purpose*

The Corporate Defendants argue that Aarow has not sufficiently alleged the existence of an "overt act" in furtherance of a conspiracy. (ECF No. 69-1 at 18.) They also argue that Aarow has failed to allege a requisite "unity of purpose."[6] (*Id.* at 19.) The Individual Defendants do not join in this argument. (*See* ECF No. 70.) The Court will not dismiss the conspiracy claim on this basis.

Under Maryland law, civil conspiracy is a "combination of two or more persons by an agreement or understanding to accomplish an unlawful act or use unlawful means to accomplish an unlawful act not in itself illegal, with the further requirement that the act or means must result in damages to the plaintiff." *Hoffman v. Stamper*, 867 A.2d 276, 290 (Md. 2005) (citation and internal quotation marks omitted). To prove conspiracy, "[t]he plaintiff must also prove the

---

[6]   Defendants contend that "Aarow's discussion of the requirements for its civil conspiracy claim misconstrues the Corporate Defendants' arguments" and that "[t]he Motion to Dismiss did not allege that the absence of any overt acts by the Corporate Defendants was itself sufficient to dismiss that claim." (ECF No. 78 at 9.) Although the Court will address both the "overt act" and "unity of purpose" arguments, Corporate Defendants' argument in their Motion to Dismiss was primarily one related to overt acts. Indeed, one of Defendants' four arguments is that "Aarow has not adequately alleged an 'overt act' committed by Tricore or NTI in furtherance of the alleged conspiracy." (ECF No. 69-1 at 18–19 (also noting in the subheading that Aarow failed to allege an overt act, not that it failed to allege unity of purpose).) Subsumed in that argument, Defendants included a mere one sentence regarding the lack of a "unity of purpose." (*Id.* at 19.)

commission of an overt act, in furtherance of the agreement, that caused the plaintiff to suffer actual injury." *Id.* With respect to such overt act, "although he must make specific allegations connecting the defendants to the injury, [a plaintiff] need not plead an overt act against each defendant since a single act by one conspirator may sustain a conspiracy claim." *Yates v. Hagerstown Lodge No. 212 Loyal Ord. of Moose*, 878 F. Supp. 788, 803 (D. Md. 1995); *see also Alleco, Inc. v. Harry & Jeanette Weinberg Found., Inc.*, 639 A.2d 173, 179 (Md. Ct. Spec. App., 1994), *aff'd*, 665 A.2d 1038 (Md. 1995) ("It is not necessary, therefore, for a plaintiff to allege or prove that each member of the conspiracy committed some independent unlawful act in furtherance of the agreement, only that one or more of them committed such an act and that harm ensued to the plaintiff as a result."). Further, in a civil conspiracy case, "[a] plaintiff must establish a unity of purpose or a common design and understanding, or a meeting of the minds in an unlawful arrangement." *Cavalier Mobile Homes, Inc. v. Liberty Homes, Inc.*, 454 A.2d 367, 372 (Md. Ct. Spec. App., 1983) (citation and quotations omitted). In addition, it is well established that "a conspiracy may be proved by circumstantial evidence, for in most cases it would be practically impossible to prove a conspiracy by means of direct evidence alone." *Hoffman*, 867 A.2d at 291 (citation omitted). Specifically, "a conspiracy may be established by inference from the nature of the acts complained of, the individual and collective interest of the alleged conspirators, the situation and relation of the parties at the time of the commission of the acts, the motives which produced them, and all the surrounding circumstances preceding and attending the culmination of the common design." *Id.*

With that background in mind, the Court turns to the Corporate Defendants' arguments that Aarow has not sufficiently alleged an overt act by them or unity of purpose. First, there is no requirement that Aarow allege that each Defendant committed an overt act. The Court will

18

therefore not dismiss the claims against the Corporate Defendants on that basis.

Second, Aarow has sufficiently alleged that there was a unity of purpose. As noted above, a conspiracy may be inferred by circumstantial evidence. In a recent case relating to conspiracy, Judge Gallagher of this Court explained that the complaint alleged "that several then-[Blades of Green] employees misappropriated its documents, attempted to destroy the evidence thereof, and subsequently became affiliated with [a competitor,] Go Green." *Blades of Green, Inc. v. Go Green Lawn & Pest, LLC.*, 598 F. Supp. 3d 348, 358 (D. Md. 2022). The court found that "[r]ead in the light most favorable to it, the Complaint contains sufficient factual allegations to raise a plausible inference that these individuals shared with Go Green a 'unity of purpose or a common design,' sufficient to form a conspiracy." *Id.*

So too here the Court finds that—at this stage of litigation and when viewing the allegations in the light most favorable to Aarow, as it must—Aarow has sufficiently alleged that there was a unity of purpose. Aarow has alleged that the Former Employees misappropriated various categories of documents and information, deleted emails and other documents, misrepresented to clients that Aarow could not perform contracted work, and became affiliated with Tricore, and Tricore then misappropriated some subset of the projects.[7] These allegations are sufficient, at least for the purposes of a motion to dismiss, to show that the Defendants shared a unity of purpose to commit unlawful acts.

### c. *Principal and Agent*

Defendants next argue that "once the Former Employees were hired by Tricore, any alleged civil conspiracy between Tricore ceased to exist" and that "[a]t most, the alleged conspiracy lasted

---

[7]   Defendants only argue that "neither of the two occurrences that Aarow attributes to Tricore are sufficient—either in isolation or in aggregate—to infer 'a finding of a unity of purpose or a common design' between Tricore and the Individual Defendants." (ECF No. 69-1 at 19.) Defendants do not make a similar argument with respect to NTI.

from or about January 3, 2022 through August 23, 2022 and is no longer ongoing." (ECF No. 69-1 at 20.)

"Both the United States Court of Appeals for the Fourth Circuit and Maryland apply the intracorporate conspiracy doctrine, which provides that a conspiracy between a corporation and its agent acting within the scope of his employment is a legal impossibility." *Tffi Corp. v. Williams*, Civ. No. DKC-13-1809, 2016 WL 470865, at *8 (D. Md. Feb. 8, 2016) (quotations and citation omitted). Thus, this doctrine would apply only to the extent that any Individual Defendants were agents of Tricore and were acting within the scope of their employment. As Defendants appear to acknowledge, there could therefore be a conspiracy between certain Individual Defendants and the Corporate Defendants before the Former Employees were hired to work at Tricore. Further, whether any of the Individual Defendants were acting as agents within the scope of his or her employment is a fact-intensive inquiry, and the Court will not make such determination at this stage of the litigation. *See, e.g., Mathews v. Johns Hopkins Health Sys., Corp.*, Civ. No. PX 16-4013, 2017 WL 2986363, at *3 n.2 (D. Md. July 13, 2017) ("[W]hether two entities are functionally the same to satisfy the intra-corporate conspiracy doctrine is a fact-intensive inquiry, making it particularly inappropriate for resolution at the motion to dismiss stage."). Accordingly, the conspiracy claim will not be dismissed on this basis.

### d. Allegations Against David Taylor, Wilson, and NTI

Defendants also argue that Aarow fails to sufficiently allege a conspiracy claim against David Taylor, Wilson, and NTI because Aarow "fail[s] to allege an 'agreement or understanding' between them and Tricore to compete against Aarow, misappropriate Aarow's trade secrets or other confidential or proprietary information, or for the Former Employees to breach their fiduciary duties." (ECF No. 69-1 at 20.)

In the context of a conspiracy claim—which, by its nature is generally surreptitious—rarely will a plaintiff be in possession of direct evidence of an agreement or understanding. As the Supreme Court of Maryland has explained:

> Conspirators do not voluntarily proclaim their purposes; their methods are clandestine. It is sufficient if the proven facts and circumstances, pieced together and considered as a whole, convince the court that the parties were acting together understandingly in order to accomplish the fraudulent scheme. Thus a conspiracy may be established by inference from the nature of the acts complained of, the individual and collective interest of the alleged conspirators, the situation and relation of the parties at the time of the commission of the acts, the motives which produced them, and all the surrounding circumstances preceding and attending the culmination of the common design.

*Hoffman*, 867 A.2d at 291. The necessity of considering inferences is particularly acute at the motion to dismiss stage, where a plaintiff is not yet in possession of discovery. Indeed, a plaintiff is only required to plead sufficient factual content that "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

Further, a plaintiff "need not . . . allege exactly how the agreement was made—i.e., where and when, and with what words, the agreement was formed." *Moxley v. Town of Walkersville*, 601 F. Supp. 2d 648, 668 (D. Md. 2009) (citations, quotations, and alterations omitted). "Rather, plaintiff is required only to allege an agreement or make averments that there was a communication, consultation, cooperation, or command from which such an agreement can be inferred." *Id.* (citations, quotations, and alterations omitted).

In addition, a plaintiff may make allegations upon information and belief, as it is "a permissible way to indicate a factual connection that a plaintiff reasonably believes is true but for which the plaintiff may need discovery to gather and confirm its evidentiary basis." *Davidson v. Sarnova, Inc.*, Civ. No. JKB-17-1067, 2017 WL 5564654, at *4 (D. Md. Nov. 20, 2017); *see also Malibu Media, LLC v. Doe*, Civ. No. PWG-13-365, 2014 WL 7188822, at *4 (D. Md. Dec. 16,

21

2014) (explaining that "pleading facts alleged 'upon information and belief'" is permissible "where the facts are peculiarly within the possession of the defendant, or where the belief is based on factual information that makes the inference of culpability plausible" (citation and quotations omitted).).

The Court finds that Aarow has sufficiently alleged an agreement or understanding with respect to its conspiracy claim against Wilson, David Taylor, and NTI. Although Aarow's allegations are somewhat sparse, they plausibly raise an inference that these Defendants are liable and "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 545. Aarow alleges that Wilson—part owner and president of NTI—"personally communicated with general contractors regarding Aarow and Tricore bids" using Aarow information that Wilson "was assisting Tricore to surreptitiously transfer to Tricore[.]" (Am. Compl. at ¶ 86.) Aarow alleges that "[w]ith Mike Wilson's assistance, the Former Employees were able to facilitate a wide-scale transfer of Aarow projects, customers, and internal documents to Tricore." (*Id.*) Aarow also alleges that "[u]pon information and belief, discovery will reveal that Mike Wilson personally participated in a far larger part of the conspiracy than alleged above, including planning, funding, providing back-office support, and communicating with clients in furtherance of the conspiracy." (*Id.* ¶ 87.) Aarow also alleges that David Taylor—part owner of NTI and Tricore—provided feedback on a spreadsheet created by Steele (while Steele was still employed with Aarow) and that the spreadsheet detailed a five-year plan to open a Tricore electrical division with a revenue that would only be possible if Tricore was bringing in existing work. (*Id.* ¶ 51.) Aarow also alleges that David Taylor and Steele were communicating in March 2022, while Steele was still employed with Aarow. (*Id.*) The Court finds that these allegations are sufficient to infer an agreement or understanding to improperly compete against Aarow.

For the same reasons, the Court also finds that Aarow has provided sufficient allegations

against NTI, given that David Taylor and Wilson are alleged to be part-owners of NTI. *See In re*

*Am. Honda Motor Co., Inc. Dealerships Rels. Litig.*, 958 F. Supp. 1045, 1051 n.3 (D. Md. 1997)

("[T]he critical question is whether the illegal conduct alleged was known to and participated in

by sufficiently high-level employees within a corporation and/or was sufficiently pervasive within

the corporation as to be fairly attributable to the corporation."). Further, Aarow alleges additional

facts against NTI, which bolster the Court's conclusion that the conspiracy claim should not be

dismissed against it. For instance, Aarow alleges that "[o]ther employees and agents of NTI . . .

engaged in the same or similar conduct as Mike Wilson. NTI itself also supplied the Former

Employees . . . with home office supplies and NTI emails at times when the Former Employees

were still employed at Aarow in order to facilitate the conspiracy." (Am. Compl. ¶ 88.)

### 4. *Unfair Competition Claim against NTI*

Aarow brings an unfair competition claim (Count VII) against all Defendants. The

Corporate Defendants argue in their Motion to Dismiss that Aarow does not sufficiently allege the

claim against NTI. (ECF No. 69-1 at 23.) The Individual Defendants—other than David Taylor

in his separate Motion to Dismiss, discussed in more detail below—do not challenge this claim.

(*See* ECF No. 70 (only challenging Count VII as preempted by the MUTSA).)

Defendants explain that "Count VII must be dismissed against NTI, as Aarow has not

alleged any facts supporting its baseless assertion that '[a]ll defendants also engaged in unfair

competition . . . by using and disclosing Aarow's confidential and proprietary information in

competition against Aarow.' All claims against NTI must also be dismissed if this Court dismisses

the related claims against Tricore." (ECF No. 69-1 at 23.) This is the entirety of Defendants'

argument in support of dismissing the unfair competition claim against NTI, and Defendants cite

no authority and provide no support for this argument. Accordingly, the Court will not dismiss Count VII against NTI and will only dismiss that claim insofar as it seeks to bring a claim based on trade secret information, as discussed above.

### 5. Aiding and Abetting Claims Against David Taylor, Wilson, and NTI

Aarow also brought three aiding and abetting claims against the Defendants: aiding and abetting misappropriation of trade secrets in violation of the DTSA and of the MUTSA (Counts III and IV) and aiding and abetting Former Employees' breaches of fiduciary duty (Count VI). Counts III and IV were brought against Wilson and NTI and Count VI was brought against David Taylor, Wilson, and NTI. Defendants argue that these aiding and abetting claims must be dismissed against NTI. (*See* ECF No. 69-1 at 21–23.) Wilson joins in this argument, although he does not make any specific arguments with respect to his liability. (ECF No. 70.) David Taylor also joins this argument, but likewise does not make specific arguments with respect to his liability (*id.*), other than those he provides in his separate Motion to Dismiss (ECF No. 71), discussed later.

"Maryland has expressly recognized aider and abettor tort liability." *Alleco Inc. v. Harry & Jeanette Weinberg Found., Inc.*, 665 A.2d 1038, 1049 (Md. 1995). "[C]ivil aider and abettor liability, somewhat like civil conspiracy, requires that there exist underlying tortious activity in order for the alleged aider and abettor to be held liable." *Id.* at 1050. "A defendant is civilly liable as an aider and abettor where (1) there is a violation of the law (tort) by the 'principal,' (2) defendant knew about the violation, and (3) defendant gave substantial assistance or encouragement to the principal to engage in the tortious conduct." *Id.* at 1043 (alterations omitted).

Defendants argue that "Aarow has failed to allege adequately [an underlying] violation by Tricore or any Former Employee[.]" (ECF No. 69-1 at 22.) However, as noted above, the Court will not dismiss Aarow's DTSA, MUTSA, or breach of fiduciary duty claims.

24

Defendants also argue that Aarow has failed to allege substantial encouragement or assistance.[8] (ECF No. 69-1 at 22.) However, Aarow makes various allegations against Wilson, including that "[u]pon information and belief, discovery will reveal that" he engaged in various activities, including planning, funding, providing back-office support, and communicating with clients in furtherance of the conspiracy." (Am. Compl. ¶ 87). Aarow also alleged that "[o]ther employees and agents of NTI . . . engaged in the same or similar conduct as Mike Wilson. NTI itself also supplied the Former Employees . . . with home office supplies and NTI emails at times when the Former Employees were still employed at Aarow in order to facilitate the conspiracy." (*Id.* ¶ 88.) This is sufficient to allege aiding and abetting liability against Wilson and NTI. *See Alleco*, 665 A.2d at 1049 ("A person may be held liable as a principal . . . if he, by any means (words, signs, or motions) encouraged, incited, aided or abetted the act of the direct perpetrator of the tort." (citations omitted)). The Court will therefore permit the aiding and abetting claims to proceed against Wilson and NTI.

The only aiding and abetting claim against David Taylor is aiding and abetting breach of fiduciary duty. As discussed in more detail below, the Court will also permit that claim to proceed against him.

### *C.  David Taylor's Motion to Dismiss*

Aarow brought three claims against David Taylor: aiding and abetting breach of fiduciary duties (Count VI); unfair competition (Count VII); and civil conspiracy (Count VIII). David

---

[8]  Defendants also argue that a plaintiff must show that a defendant possess a "high conscious intent" and a "conscious and specific motivation." (ECF No. 69-1 at 22 (citing *Schatz v. Rosenberg*, 943 F.2d 485 (4th Cir. 1991) and *Legends Title, LLC v. Cap. One, Nat'l Ass'n*, Civ. No. 22-00650-JRR, 2023 WL 2410851 (D. Md. Mar. 7, 2023).) This language comes from federal securities fraud cases. This is not such a case and Defendants have cited no authority suggesting that the Court should use such a standard in a case such as this one, which does not involve fraud or the federal securities laws. In any event, the Court finds that Aarow has sufficiently alleged Defendants' knowledge of the underlying violations.

Taylor argues that the civil conspiracy and aiding and abetting claims must be dismissed because "Aarow has failed to establish that the alleged underlying actions are sufficient to form the basis of a breach of fiduciary duty." (ECF No. 71-1 at 5.)  He also argues that the unfair competition claim must be dismissed because Aarow does not allege any "fraud, deceit, or trickery" and his involvement in Steele's interview process and providing comments on Steele's spreadsheet does not rise to the level of unfair competition.  (*Id.* at 8.)  The Court addresses—and rejects—those arguments below.

### 1. *Breach of Fiduciary Duty*

David Taylor argues that Aarow fails to sufficiently allege the underlying breach of fiduciary duty by Steele (former COO of Aarow).  The Court disagrees.

"As a corporate officer of [Aarow], [Steele] owed it certain fiduciary duties.  One of these duties was that of loyalty; corporate officers and employees owe an undivided and unselfish loyalty to the corporation." *Hale Trucks of Maryland, LLC v. Volvo Trucks N. Am., Inc.*, 224 F. Supp. 2d 1010, 1023 (D. Md. 2002).  "A direct corollary of this general principle of loyalty is that a corporate officer or other high-echelon employee is barred from actively competing with his employer during the tenure of his employment, even in the absence of an express covenant so providing." *Maryland Metals, Inc. v. Metzner*, 382 A.2d 564, 568 (Md. 1978).  Therefore, "prior to his termination . . . [an employee] must refrain from actively and directly competing with his employer for customers and employees, and must continue to exert his best efforts on behalf of his employer." *Id.*

However, employees may prepare and make arrangements to compete with their employer while still employed without breaching their fiduciary duties. *See Crawford & Co. v. M. Hayes & Associates, L.L.C.*, 13 Fed. Appx. 174, 176 (4th Cir. 2001).  Still:

> The right to make arrangements to compete is by no means absolute and the exercise of the privilege may, in appropriate circumstances, rise to the level of a

26

breach of an employee's fiduciary duty of loyalty. Thus, the privilege has not been applied to immunize employees from liability where the employee has committed some fraudulent, unfair or wrongful act in the course of preparing to compete in the future. Examples of misconduct which will defeat the privilege are: misappropriation of trade secrets; misuse of confidential information; solicitation of employer's customers prior to cessation of employment; conspiracy to bring about mass resignation of employer's key employees; [and] usurpation of employer's business opportunity.

*Metzner*, 382 A.2d at 569–70 (citations omitted).

Given the allegations in the Amended Complaint, the Court cannot say that Steele's activities fall within the ambit of permissible competition, and finds that Aarow has sufficiently alleged a breach of fiduciary duty. As explained above, Aarow alleged that, in January 2022 when Steele was still employed at Aarow, he created a spreadsheet "detail[ing] a five-year plan to open up a Tricore electrical division with a year one revenue of $6,850,000" and that "[t]he only way to generate such revenue in the first year of a new business is to bring on pre-existing work." (Am. Compl. ¶ 51.) Aarow also alleges that the spreadsheet contained "specific references to Tricore and / or NTI weighing in on the cost projections"; that David Taylor (part owner of NTI and Tricore) edited the spreadsheet; and that Steele's laptop files show that he was corresponding with David Taylor in March of 2022. (*Id.* ¶¶ 52–53.) Steele also "uploaded and sent numerous files or emails from his Aarow laptop to his personal Gmail account with titles matching projects that Aarow was working, had bid, or was in the process of bidding." (*Id.* ¶ 69.) Steele ultimately received an offer of employment from Tricore in April 2022. (*Id.* ¶ 64.) Steele allegedly deleted all sent emails from his Aarow email address for the past two years prior to leaving Aarow. (*Id.* ¶ 75.)

Further, the Court finds that Aarow has sufficiently alleged aiding and abetting against David Taylor with respect to this claim. While the allegations against him are somewhat sparse, the Court does not view them in a vacuum. As noted above, David Taylor is alleged to have

27

provided comments and feedback on Steele's spreadsheet—which Steele created when he was still employed with Aarow—that allegedly contemplated misappropriating a portion of Aarow's business. Taking the allegations in the light most favorable to Aarow, along with the reasonable inferences therefrom, the Court finds that Aarow has sufficiently alleged substantial encouragement or assistance by David Taylor. *See Alleco*, 665 A.2d at 1049 ("A person may be held liable as a principal . . . if he, by any means (words, signs, or motions) encouraged, incited, aided or abetted the act of the direct perpetrator of the tort." (citations omitted)).

At this stage, the Court only tests the sufficiency of a complaint, and—given the constellation of facts Aarow has alleged—the Court finds that Aarow has sufficiently alleged the underlying breach of fiduciary duty and David Taylor's aiding and abetting of that breach.[9]

### 2. *Unfair Competition*

David Taylor also argues that Aarow has insufficiently alleged unfair competition. A claim for unfair competition "is laid upon the premise that, while it encourages fair trade in every way and aims to foster, and not to hamper, competition, no one . . . is justified in damaging or jeopardizing another's business by fraud, deceit, trickery or unfair methods of any sort." *Baltimore Bedding Corp. v. Moses*, 34 A.2d 338, 342 (Md. 1943). This Court has recognized that the Maryland Supreme Court "has preserved a high degree of flexibility in the law of unfair competition," *Delmarva Sash & Door Co. of Maryland v. Andersen Windows, Inc.*, 218 F. Supp. 2d 729, 733 (D. Md. 2002), as "[w]hat constitutes unfair competition in a given case is governed by its own particular facts and circumstances." *Baltimore Bedding Corp.*, 34 A.2d at 342; *see also*

---

[9]     Although David Taylor cites various cases in support of dismissing this claim, these cases were decided after the relevant court considered competing facts, after a bench trial or on summary judgment, rather than at the motion to dismiss stage. *(See* ECF No. 71-1 at 5–6 (citing *Crawford & Co. v. M. Hayes & Associates, L.L.C.*, 13 Fed. Appx. 174 (4th Cir. 2001) (bench trial); *Operations Research, Inc. v. Davidson & Tailbird, Inc.*, 217 A.2d 375 (Md. Ct. App. 1966) (bench trial); *Dworkin v. Blumenthal*, 551 A.2d 947 (Md. Ct. Spec. App. 1989) (bench trial); *Hale Trucks of Md., LLC v. Volvo Trucks N. Am., Inc.*, 224 F. Supp. 2d 1010 (D. Md. 2002) (summary judgment)).)

*GAI Audio of New York, Inc. v. Columbia Broad. Sys., Inc.*, 340 A.2d 736, 748 (Md. Ct. Spec. App. 1975) ("The legal principles which are controlling here are simply the principles of old-fashioned honesty." (citation omitted).)

David Taylor argues that the unfair competition claim against him must be dismissed Aarow has failed to allege fraud, deceit, or trickery. However, an unfair competition claim may be premised on "fraud, deceit, trickery or *unfair methods of any sort.*" *Baltimore Bedding Corp.*, 34 A.2d at 342 (emphasis added); *see also Paccar Inc. v. Elliot Wilson Capitol Trucks LLC*, 905 F. Supp. 2d 675, 691 (D. Md. 2012) (explaining that "[t]he Court disagrees that misleading or deceptive conduct is a necessary element of every unfair competition claim"; "Maryland courts' description of the tort is not so narrowly drawn"; and that "key treatises recognize the necessarily open-ended nature of the tort of unfair competition"). While an unfair competition cause of action has its outer limits, given the flexibility of this cause of action and the allegations regarding Steele's and David Taylor's conduct, the Court finds that Aarow has sufficiently alleged unfair competition. *See, e.g., Sinclair Broad. Grp., Inc. v. Colour Basis, LLC*, Civ. No. CCB-14-2614, 2016 WL 3541204, at *10 (D. Md. June 29, 2016) (denying summary judgment where, "[g]iven the flexibility of the cause of action . . . the court cannot say that, drawing all inferences in favor of [plaintiff], a reasonable jury could not find that [defendant] used 'unfair methods of any sort' in its communications[.]").

## IV. *Motion to Redact*

Plaintiff has filed a Motion to Redact. (ECF No. 48.) It seeks the redaction of certain portions of a September 20, 2022 transcript relating to a previously-filed motion for a temporary restraining order. (*Id.*) The Motion will be granted, as the redactions are limited in nature and are meant to limit the disclosure of certain confidential business information. Aarow will be directed

to file a transcript with the redactions it identifies in its Motion.

## V.  *Conclusion*

For the foregoing reasons,  the Corporate Defendants' Motion to Certify (ECF No. 68) will be denied; the Corporate Defendants' Motion to Dismiss (ECF No. 69) will be granted in part and denied in part; the Individual Defendants' Motion to Join the two Motions filed by the Corporate Defendants (ECF No. 70) will be granted; David Taylor's Motion to Dismiss (ECF No. 71) will be denied; and Aarow's Motion to Redact (ECF No. 48) will be granted.  Accordingly, all Counts in the Amended Complaint may proceed, but Counts V through IX are dismissed to the extent that they are based on trade secrets.

DATED this 21 day of September, 2023.

BY THE COURT:

James K. Bredar
Chief Judge

30