IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| AAROW ELECTRICAL SOLUTIONS, | * | |
| Plaintiff, | * | |
| v. | * | CIVIL NO. JKB-22-2363 |
| TRICORE SYSTEMS, LLC *et al.*, | * | |
| Defendants. | * | |

\* \* \* \* \* \* \* \* \* \* \* \*

**MEMORANDUM**

Plaintiff Aarow Electrical Solutions, LLC ("Aarow") filed a Second Amended Complaint. (Sec. Am. Compl., ECF No. 106.) Aarow brings claims against two new defendants: Veritas Consulting Group, LLC ("Veritas") and Thomas Bednarik.[1] Pending before the Court are four Motions to Dismiss filed by NTI and Tricore, the Individual Defendants, Veritas, and Bednarik. (ECF Nos. 111, 112, 133, 136.)

## I. Factual and Procedural Background

In short, Aarow alleges that the Defendants used various means—including misappropriating trade secrets and confidential information and interfering with client contracts—to effectively steal a portion of its business. Because the Second Amended Complaint is nearly identical to the Amended Complaint, the Court will first provide below the factual background from a prior Memorandum. That prior Memorandum—which includes citations to the then-operative Amended Complaint—accompanied the Court's Order denying in large part the Original

---

[1] Aarow also brings claims against defendants that had been named in prior complaints (the "Original Defendants"): National Technology Integrators, LLC ("NTI") and Tricore Systems, LLC ("Tricore") and Individual Defendants Ralph David Hummer, Anthony Reyes, Candace Santos, Jonathon Steele, John Taylor, Chad Tippett, Nathan Velozo, Michael Gregory Wilson, and David Paul Taylor.

1

Defendants' Motions to Dismiss. The Court will next summarize the relevant procedural history. Finally, the Court will provide a summary of the additional allegations contained in the now-operative Second Amended Complaint.

### A. Factual Background from Amended Complaint

As the Court explained in its prior Memorandum and Order:

> Aarow is a "full-service electrical contractor" which "means that Aarow works with low voltage lighting, power, fire alarms, and systems and medium voltage power." (Am. Compl. ¶ 17[, ECF No. 64].) Tricore, prior to the events at issue, "had never performed any electrical work and instead limited its business to low-voltage work." (*Id.* ¶ 43.) Tricore's work was different from Aarow's in that "Tricore only worked a low-voltage in A/V, communications, and security[.]" (*Id.*) NTI likewise performed low-voltage work. (*Id.* ¶ 44.) NTI and Tricore are different entities, but "maintain a close business relationship." (*Id.*)
>
> Aarow "possesses trade secret information from which it derives economic value" and "possesses non-trade secret confidential information as part of its existence as an operating company." (*Id.* ¶¶ 18–19.) Aarow alleges that its work is "highly competitive" and that "[t]he way contractors develop their bid proposals, pricing strategies, and construction strategies is crucial to developing business, and if accessed by competitors, would allow competitors to undercut pricing and gain an easy economic advantage." (*Id.* ¶¶ 21–22.)
>
> Aarow alleges that it keeps its bidding, budgeting, and certain other information and documents confidential. (*Id.* ¶¶ 23–25.) For instance, Aarow alleges that it "password-protect[s] computers and online accounts, us[es] a private server to store information, [and] operat[es] from a secure facility." (*Id.* ¶ 32.) It also "provided password-protected laptops for each employee to work remotely to prevent unnecessary overlap with employees' personal electronics." (*Id.* ¶ 33.) In addition, Aarow includes a confidentiality statement on client proposals indicating that such proposal is "considered private and confidential" and that "[s]haring of Aarow Pricing and SOW is not allowed without specific written authorization[.]" (*Id.* ¶ 34.) Further, Aarow's Employee Handbook—which each of the Former Employees signed—provides that the "[u]nauthorized disclosure of business 'secrets' or confidential information" could result in "disciplinary action, up to and including termination of employment." (*Id.* ¶¶ 37, 39.)
>
> Beginning in late 2021 through August 2022, the Former Employees left Aarow to work for Tricore: Hummer was the first to leave Aarow in late 2021 and became Tricore's president, and John Taylor was the last to leave Aarow on August 23, 2022 and became a Tricore assistant project manager. (*Id.* ¶¶ 48, 89.) Aarow alleges that, during this exodus, the Defendants misappropriated Aarow's business

2

in various ways. Aarow's allegations against the Former Employees can be summed up as follows:

> While employees of Aarow, the Former Employees systematically paved the way for their future employer, Tricore, by among other things, forwarding competitive pricing materials to Tricore, delaying progress on current Aarow projects, and performing work on behalf of Tricore during working hours as Aarow employees.

(*Id.* ¶ 67.) Below are examples of such allegations.

In January 2022, when Steele was still employed at Aarow, he created a spreadsheet "detail[ing] a five-year plan to open up a Tricore electrical division with a year one revenue of $6,850,000. The only way to generate such revenue in the first year of a new business is to bring on pre-existing work." (*Id.* ¶ 51.) Aarow alleges that the spreadsheet contained "specific references to Tricore and / or NTI weighing in on the cost projections"; that David Taylor (part owner of NTI and Tricore) edited the spreadsheet; and that Steele's Aarow laptop files show that he was corresponding with David Taylor in March of 2022. (*Id.* ¶¶ 52–53.) Steele also "uploaded and sent numerous files or emails from his Aarow laptop to his personal Gmail account with titles matching projects that Aarow was working, had bid, or was in the process of bidding" and that "[m]any of those projects" were "ultimately [] worked by Tricore[.]" (*Id.* ¶ 69.) Steele received an offer of employment from Tricore in April 2022 and became their Chief Operating Officer ("COO"). (*Id.* ¶ 64.) Steele allegedly deleted all sent emails from his Aarow email address for the two years prior to leaving Aarow. (*Id.* ¶ 75.)

Aarow also alleges that, on May 5, 2022, John Taylor (then an Aarow employee) downloaded data from Aarow's "Accubid" database, which Aarow uses to track and prepare bids. (*Id.* ¶ 72.) The data included information "for numerous projects, includ[ing] names, dates of bids, the cost of bids, the status of the bid, and the anticipated hours to complete the bidded work." (*Id.*) He then created a spreadsheet with this information. (*Id.*) Aarow alleges that it never downloads Accubid data in this manner, and that the spreadsheet created by John Taylor would be a "surplus" which "clearly indicates it was intended for use outside of Aarow[.]" (*Id.*) John Taylor ultimately left Aarow for Tricore in August 2022. (*Id.* ¶ 89.) He allegedly deleted all documents from October 21, 2020 through his last day at Aarow from his "Documents" folder. (*Id.* ¶ 77.)

Aarow alleges that the Defendants misappropriated or otherwise interfered with various specific projects. (*Id.* ¶ 95–96.) For instance, on June 21, 2022, John Taylor (then an Aarow employee) submitted a proposal on behalf of Aarow for a Kaiser Permanente "Ashburn Project." (*Id.* ¶ 97.) Two weeks later, Steele (then the COO of Tricore) submitted a proposal for the Ashburn Project. (*Id.* ¶ 101.) Aarow only learned that Tricore also bid on the project when "Kaiser Permanente apparently attempted to email Tony Reyes (then a Tricore employee) on August 9, 2022 about the KP Ashburn Project, but instead responded to Tony Reyes's Aarow

3

> email address." (*Id.* ¶ 102.) Tricore's proposal had "the same sections as Aarow's proposal" and "each of those sections [was] letter-for-letter identical to the Aarow proposal." (*Id.* ¶ 103.) A nearly identical chain of events occurred with respect to a Kaiser Permanente "Manassas Nurse Call Project." (*Id.* ¶ 105–11.) Aarow makes allegations regarding several other projects, including that Reyes "met with [client] Kaiser Permanente on Tricore's behalf, where he convinced Kaiser Permanente to breach its contract with Aarow on at least two construction projects" and to move the work over to Tricore. (*Id.* ¶ 91; *see also* ¶¶ 112–19.)

(ECF No. 80 at 2–5.) Aarow brought the following claims in its Amended Complaint: misappropriation of trade secrets in violation of the Defend Trade Secrets Act ("DTSA") (Count I); misappropriation of trade secrets in violation of the Maryland Uniform Trade Secrets Act ("MUTSA") (Count II); aiding and abetting misappropriation of trade secrets in violation of the DTSA (Count III); aiding and abetting misappropriation of trade secrets in violation of the MUTSA (Count IV); breach of fiduciary duties (Count V); aiding and abetting breaches of fiduciary duty (Count VI); unfair competition (Count VII); civil conspiracy (Count VIII); and tortious interference with contract (Count IX).

### B. Court's Ruling

The Defendants named in the Amended Complaint filed, *inter alia*, Motions to Dismiss, which the Court granted in part and denied in part. (*See generally* ECF Nos. 80, 81.) The Court dismissed Counts V through IX to the extent that they were based on trade secrets, because they were preempted by MUTSA. (ECF No. 80 at 10–11.) However, the Court did not dismiss the claims to the extent that they were based on non-trade secret confidential information. (*Id.*) Thus, the Court explained that "all Counts in the Amended Complaint may proceed, but Counts V through IX are dismissed to the extent that they are based on trade secrets." (*Id.* at 31.)

### C. Additional Allegations from the Second Amended Complaint

Aarow filed a Second Amended Complaint, which includes the same allegations as the Amended Complaint, but adds Defendants, some facts, and an additional claim.

4

The Second Amended Complaint names Veritas, Bednarik, and John Does 1–10 as Defendants. (*See generally* Sec. Am. Compl.) With respect to Veritas, Aarow alleges that "[a]lthough Veritas is a separate entity from Tricore and NTI, they maintain a close business relationship along with NTI" and that "[a]lthough Tricore, NTI, and Veritas are separate legal entities, upon information and belief, they effectively acted as interchangeable parts of a single business." (*Id.* ¶¶ 49, 52.) Further, Aarow alleges that "the shift in Tricore work also benefitted Veritas" and that "once Tricore began performing electrical work, Veritas was able to secure larger projects for itself with Tricore as its subcontractor." (*Id.* ¶¶ 49, 50.) Aarow explains David Taylor, in addition to being an owner of NTI and Tricore, is an owner of Veritas. (*Id.* ¶ 12.)

Aarow alleges that Bednarik was an Electrical Foreman at Aarow. (*Id.* ¶ 14.) Aarow alleges that he left on June 15, 2022 to become a "Tricore Electrical Foreman/Superintendent" and that "his participation in the scheme was key because Bednarik holds a Maryland Master Electrician license. Upon information and belief, without such a license Tricore would not be able to bid on or perform electrical work requiring a Maryland license." (*Id.* ¶¶ 87, 89.)

In addition to the claims Aarow brought in the Amended Complaint, the Second Amended Complaint adds Count X: tortious interference with business relationships. (*Id.* ¶¶ 208–17.) Further, Aarow adds to Count VI (aiding and abetting former employees' breaches of fiduciary duty), Count VII (unfair competition), Count VIII (civil conspiracy), and Count IX (tortious interference with contract) allegations that the actions were taken by certain Defendants "with actual, wanton, and reckless disregard" and with "malice" and Aarow seeks punitive damages with respect to those counts. (*Id.* ¶¶ 185, 194, 199, 207.)

II. **Legal Standard**

When considering a motion to dismiss pursuant to Rule 12(b)(6), the Court must "accept

5

as true all well-pleaded allegations and view the complaint in the light most favorable to the plaintiff." *Venkatraman v. REI Sys., Inc.*, 417 F.3d 418, 420 (4th Cir. 2005). To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 446 U.S. at 662. A "pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.' Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Id.* at 678 (alteration in original) (quoting *Twombly*, 550 U.S. at 555, 557).

### III.  Original Defendants' Motions to Dismiss

The Original Defendants raise three arguments in support of their Motions to Dismiss. (ECF Nos. 111, 112.) The Court considers each of the arguments in turn.

#### A. Preemption

The Original Defendants argue that "Aarow reasserted in Counts V through IX, and added to newly asserted Count X, certain allegations from its First Amended Complaint that were already dismissed by this Court's Order dated September 21, 2023" and accuse Aarow of "ignor[ing]" and "refus[ing] to comply with" the Court's Order. (ECF No. 111-1 at 6, 12.) Aarow explains that it is not seeking for the Court to reconsider any prior rulings, and that "[t]he Court has already resolved these claims by way of its prior Order [], and neither the Court nor the parties need address the matter further in the context of the Second Amended Complaint." (ECF No. 126 at 7–8.)

As noted above, the Court previously concluded that Aarow's common law claims in Counts V through IX based on misappropriation of trade secrets are preempted by the MUTSA,

6

and "Aarow may pursue its trade secret claims under the MUTSA and the DTSA and its non-trade secret claims under Maryland common law." (ECF No. 80 at 11.) That conclusion continues to hold. Thus, for clarity, the Court concludes that Counts V through IX in the Second Amended Complaint are dismissed insofar as they are based on trade secrets, but may otherwise proceed. The Court does not address Count X in this section, as that count will be dismissed in its entirety, as discussed in more detail below.

### B. Punitive Damages

Defendants next argue that Aarow has failed to satisfy the pleading requirements for punitive damages with respect to Counts V through X, and that its Rule 12(b)(6) Motion is the appropriate vehicle to bring such a challenge. (ECF No. 111-1 at 12–18.) Aarow responds that this is procedurally improper, and that a motion pursuant to Rule 12(b)(6) is the "appropriate vehicle to attempt to dismiss a *claim for relief*—not a requested remedy associated with a claim." (ECF No. 126 at 8 (emphasis in original).)

Practices in this District regarding dismissal of punitive damages claims on a Rule 12(b)(6) motion vary. *Compare Harris v. Dow Chem. Co.*, Civ. No. DKC-20-0988, 2020 WL 6874326, at *3 (D. Md. Nov. 23, 2020) (dismissing a request for punitive damages pursuant to Rule 12(b)(6)) with *Charette v. Wexford Health Sources, Inc.*, Civ. No. CCB-19-0033, 2021 WL 1102361, at *12 (D. Md. Mar. 23, 2021) (explaining that "[s]ome courts have concluded that a Rule 12(b)(6) motion is not the appropriate vehicle to challenge a request for punitive damages" and concluding that "any decision about whether [the plaintiff] may be entitled to punitive damages will be deferred, and the court will deny the defendants' motion as it pertains to the issue of punitive damages"). The Court finds that the latter course better comports with the purpose of Rule 12(b)(6) motion, which is a means by which to assert that a party has "fail[ed] to state a claim upon which relief can

be granted." Fed. R. Civ. Pr. 12(b)(6).[2] Here, Defendants' argument is better understood as a challenge to the relief Aarow seeks, rather than as a challenge to Aarow's claims.

Although the Court will not strike or dismiss the punitive damages claims at this juncture, the Court seriously doubts that punitive damages are appropriate in this case, given Maryland's high bar for the imposition of punitive damages and the facts alleged. *See Ellerin v. Fairfax Sav., F.S.B.*, 652 A.2d 1117, 1123 (Md. 1995) ("[P]unitive damages may only be awarded in such cases when the plaintiff has established that the defendant's conduct was characterized by evil motive, intent to injure, ill will, or fraud, i.e., 'actual malice.'" (citation and quotations omitted)); *Beall v. Holloway-Johnson*, 130 A.3d 406, 419 (Md. 2016) ("Punitive damages are reserved typically for punishing the most heinous of intentional torts and tortfeasors.").

For the forgoing reasons, the Court will deny Original Defendants' Motions to Dismiss to the extent that they seek dismissal of the punitive damages requests. Defendants may of course raise this issue again at the appropriate time.

### C. Count X

The Original Defendants next challenge newly-added Count X, tortious interference with business relationship. Aarow alleges in Count X that various Defendants "willfully, intentionally, and maliciously acted to interfere with Aarow's business relationships, including, but not limited

---

[2] The Fourth Circuit cases to which Defendants cite—most of which are unpublished—do not convince the Court otherwise. A theme emerges from those cases: the dismissal of a punitive damages request is appropriate where the claim upon which that request is premised has been dismissed or where the claim cannot support a request for punitive damages. *See Barrett v. Bd. of Educ. of Johnston Cnty.*, 590 F. App'x 208, 211 (4th Cir. 2014) ("Because no claims survived the Appellees' motions to dismiss, the court properly dismissed the claim for punitive damages."); *Gosnell v. Catawba Cnty.*, 646 F. App'x 318 (4th Cir. 2016) (affirming the dismissal a request for punitive damages when no claims at all remained in the case); *Corder v. Antero Res. Corp.*, 57 F.4th 384, 404 (4th Cir. 2023) (affirming the dismissal of a punitive damages request where the district court dismissed the fraud claim upon which the punitive damages were premised); *Hird v. Davis*, 155 F.3d 559 (Table) (4th Cir. 1998) (explaining that "punitive damages could not be recovered against the City on any of the claims"); *Mitchell v. Lydall, Inc.*, 16 F.3d 410 (Table) (4th Cir. 1994) (concluding that punitive damages were not available because their causes of action did not support requests for punitive damages and "hold[ing] that the district court did not err in striking [plaintiff's] claim for punitive damages under *Rule 12(f)*." (emphasis added)).

to, Aarow's business relationship with Kaiser Permanente." (Sec. Am. Compl. ¶ 211.) This count will be dismissed.

The Original Defendants argue that Aarow has failed to state a claim because "Aarow has failed to plead with specificity any contract that was reasonably likely to arise but for Defendants['] wrongful acts." (ECF No. 111-1 at 20.) They argue that Aarow "cannot broadly allege interference with vague business relationships involving unnamed third parties" and that "Aarow's allegations that Defendants interfered with Aarow's business relationships with Kaiser Permanente are not adequately pled" because Aarow has not sufficiently alleged that "Aarow would have likely been awarded such work." (*Id.* at 20–21.)

"Maryland recognizes the tort action for wrongful interference with contractual or business relationships in two general forms: inducing the breach of an existing contract and, more broadly, maliciously or wrongfully interfering with economic relationships." *Alexander & Alexander Inc. v. B. Dixon Evander & Assocs.*, 650 A.2d 260, 268 (Md. 1994) (quotations, citation, and alterations omitted). The elements of tortious interference with an economic relationship are: "(1) intentional and wil[l]ful acts; (2) calculated to cause damage to the plaintiffs in their lawful business; (3) done with the unlawful purpose to cause such damage and loss, without right or justifiable cause on the part of the defendants (which constitutes malice); and (4) actual damage and loss resulting." *Id.* at 269 (quotations and alterations omitted). In asserting a claim for wrongful interference with a business relationship, a plaintiff "must identify a possible future relationship which is likely to occur, absent the interference, with specificity." *Baron Fin. Corp. v. Natanzon*, 471 F. Supp. 2d 535, 546 (D. Md. 2006); *see also Nordstrom, Inc. v. Schwartz*, Civ. No. GJH-18-3080, 2019 WL 4221475, at *3 (D. Md. Sept. 5, 2019) (dismissing a claim where "Plaintiff d[id] not identify . . . any specific transactions with bona fide purchasers that did not occur due to Defendant's

9

conduct"); *Finley Alexander Wealth Mgmt., LLC v. M&O Mktg., Inc.*, Civ. No. GJH-19-1312, 2021 WL 1215769, at *18 (D. Md. Mar. 31, 2021) (explaining that "[a] vague allegation of 'lost sales'" is insufficient to state a claim for tortious interference with business relationship).

Aarow's allegation that the Defendants "acted to interfere with Aarow's business relationships, *including, but not limited to*, Aarow's business relationship with Kaiser Permanente" (Sec. Am. Compl. ¶ 211 (emphasis added)) is insufficient to sustain Count X as to any third-party relationships other than Kaiser Permanente ("Kaiser"). Aarow does not allege with specificity the other third-party relationships with which Defendants interfered, let alone specific transactions that did not occur with those third parties. In its briefing, Aarow likewise fails to point to any such relationships or transactions.

The Court therefore turns to the allegations in the Second Amended Complaint relating to Kaiser. Aarow alleges that Defendant Tony Reyes convinced Kaiser to breach its contract with Aarow and move the work to Tricore with respect to two projects[3] and that other former Aarow employees and Tricore staff communicated to Kaiser that Aarow was having financial difficulties. (*See, e.g.*, Sec. Am. Compl. ¶¶ 99–102.) Aarow alleges that "the concerns that Kaiser Permanente developed after meeting with Tricore's Tony Reyes were false and injured Aarow's business with Kaiser Permanente." (*Id.* ¶ 102.) Aarow makes allegations regarding various Kaiser projects: "Kaiser Permanente Ashburn Emergency Lighting"; "Kaiser Permanente Manassas Nurse Call"; "Kaiser Permanente Silver Spring Switchgear"; "Kaiser Permanente Shady Grove Lighting, Motion Sensor, and UPS Renewals." (*Id.* ¶¶ 107–129.)

---

[3] The Second Amended Complaint states that "Tony Reyes . . . convinced Kaiser Permanente to breach its contract with Aarow on at least two construction projects and move work on those projects to *Aarow*." (Sec. Am. Compl. ¶ 99 (emphasis added).) The Court presumes that this is a typographical error and that this should read "Tony Reyes . . . convinced Kaiser Permanente to breach its contract with Aarow on at least two construction projects and move work on those projects to *Tricore*."

With respect to the first two projects, Aarow alleges only that it submitted a bid and that Tricore submitted an identical bid "to secure" the projects. (*See id.* ¶¶ 107–121.) Aarow does not allege that it suffered any damage or loss, as it does not allege that it was not awarded the contract, that Tricore was awarded the contract, or that it would have been awarded the contract absent any alleged wrongdoing by the Defendants. This is insufficient to allege a tortious interference with business relationship claim. The general allegation that Kaiser developed concerns that injured Aarow's business is likewise insufficient to state a claim. With respect to the second two projects, Aarow alleges that Kaiser breached existing contracts. (*See id.* ¶¶ 122–29.) Therefore, any wrongdoing by the Defendants with respect to those contracts are covered by Count IX, which brings an interference with contract claim.

### D. Conclusion

For the foregoing reasons, the Original Defendants' Motions to Dismiss will be granted in part and denied in part. They will be granted insofar as they seek the dismissal of Counts V through IX to the extent those counts are based on trade secrets and the dismissal of Count X. They are otherwise denied.

## IV. Thomas Bednarik's Motion to Dismiss

Newly-added Defendant Bednarik argues that the counts against him—Counts I, II, V, VII, VIII, IX, and X—should be dismissed. The allegations against Bednarik are that: he left Aarow in June 2022 (around the same time as several other employees) to take a position at Tricore (Sec. Am. Compl. ¶ 87) and that "[u]pon information and belief, Bednarik's participation in the scheme was key because Bednarik holds a Maryland Master Electrician license" and that "without such a license Tricore would not be able to bid on or perform electrical work requiring a Maryland

11

license" (*id.* ¶ 89). The allegations against Bednarik are insufficient to sustain the myriad claims against him and do not plausibly reflect any wrongdoing on his part.

Aarow points the Court to its various allegations against the "Former Employees"—a group to which Bednarik belongs. (*See, e.g.*, Sec. Am. Compl. ¶ 74 ("While employees of Aarow, the Former Employees systematically paved the way for their future employer, Tricore, by among other things, forwarding competitive pricing materials to Tricore, delaying progress on current Aarow projects, and performing work on behalf of Tricore during working hours as Aarow employees.").) However, the pleading requirements necessitate more from Aarow, and these allegations do not cure the deficiencies in Aarow's Second Amended Complaint warranting dismissal of the claims against Bednarik. *See Classen Immunotherapies, Inc. v. Biogen IDEC*, 381 F. Supp. 2d 452, 455 (D. Md. 2005) ("A plaintiff does not satisfy Rule 8 when the complaint lumps all the defendants together and fails to distinguish their conduct because such allegations fail to give adequate notice to the defendants as to what they did wrong." (citation and quotations omitted)); *Phillips v. Brock & Scott, PLLC*, Civ. No. PX-16-3899, 2017 WL 3226866, at *5 (D. Md. July 28, 2017) ("Plaintiff alleges that Defendants collectively committed slander of title. This fails Federal Rule of Civil Procedure 8's notice requirement to address separately each Defendant's alleged wrongdoing."); *Crouch v. City of Hyattsville*, Civ. No. DKC-09-2544, 2010 WL 4868100, at *6 (D. Md. Nov. 23, 2010) ("[Plaintiff] cannot impose liability on . . . Defendants merely by grouping them together with the central wrongdoer."); *Taylor v. Montgomery Cnty.*, Civ. No. GJH-20-3143, 2021 WL 3857949, at *3 (D. Md. Aug. 30, 2021) ("Plaintiff's Amended Complaint must

contain specific allegations against each Defendant in order to put Defendants on adequate notice of the claims against them.").[4]

With that in mind, Aarow falls woefully short of stating a claim with respect to each of the claims it attempts to assert against Bednarik.

With respect to Counts I and II, misappropriation of trade secret claims pursuant to the DTSA and MUTSA, Aarow does not allege any of the requisite elements against Bednarik. Under both the MUTSA and DTSA, a plaintiff must show that the information at issue is a trade secret and that the defendant misappropriated that information. *See* 18 U.S.C. § 1836(b)(1); Md. Code Ann., Com. Law § 11-1201–03. Aarow does not allege what trade secrets Bednarik allegedly misappropriated nor, indeed, that he misappropriated anything. These claims will therefore be dismissed.

With respect to Count V, breach of fiduciary duties, Aarow likewise makes no relevant allegations against Bednarik. An employee owes a fiduciary duty to his employer, which prohibits an employee "prior to his termination" from "solicit[ing] for himself business which his position requires him to obtain for his employer." *Maryland Metals, Inc. v. Metzner*, 382 A.2d 564, 568 (Md. 1978). While employed, an employee "must refrain from actively and directly competing with his employer for customers and employees, and must continue to exert his best efforts on behalf of his employer." *Id.* However, "[o]nce the employment relationship comes to an end, of course, the employee is at liberty to solicit his former employer's business and employees, subject to certain restrictions concerning the misuse of his former employer's trade secrets and confidential

---

[4] Aarow seeks to distinguish several of these cases, including on the basis that they did not involve conspiracy claims. (ECF No. 144 at 5–6.) This argument misses the mark because Aarow brought six claims against Bednarik in addition to the conspiracy claim. Further, alleging a conspiracy does not suspend the pleading requirements.

information." *Id.* Nothing in Aarow's allegations raise an inference that Bednarik did anything to breach his fiduciary duty to Aarow.

In Count VII, Aarow brings an unfair competition claim against Bednarik. A claim for unfair competition "is laid upon the premise that, while it encourages fair trade in every way and aims to foster, and not to hamper, competition, no one . . . is justified in damaging or jeopardizing another's business by fraud, deceit, trickery or unfair methods of any sort." *Balt. Bedding Corp. v. Moses*, 34 A.2d 338, 342 (Md. 1943). This Court has recognized that the Maryland Supreme Court "has preserved a high degree of flexibility in the law of unfair competition," *Delmarva Sash & Door Co. of Maryland v. Andersen Windows, Inc.*, 218 F. Supp. 2d 729, 733 (D. Md. 2002), as "[w]hat constitutes unfair competition in a given case is governed by its own particular facts and circumstances." *Balt. Bedding*, 34 A.2d at 342; *see also GAI Audio of New York, Inc. v. Columbia Broad. Sys., Inc.*, 340 A.2d 736, 748 (Md. Ct. Spec. App. 1975) ("The legal principles which are controlling here are simply the principles of old-fashioned honesty." (citation omitted).) Despite the flexible approach applied to an unfair competition claim, Aarow fails to allege facts sufficient to suggest that Bednarik engaged in unfair competition.

In Count VIII, Aarow brings a civil conspiracy claim against Bednarik. The Court recognizes that a conspiracy may be proved by circumstantial evidence and that "a conspiracy may be established by inference from the nature of the acts complained of, the individual and collective interest of the alleged conspirators, the situation and relation of the parties at the time of the commission of the acts, the motives which produced them, and all the surrounding circumstances preceding and attending the culmination of the common design." *Hoffman v. Stamper*, 867 A.2d 276, 291 (Md. 2005) (citation omitted). However, the factual allegations here are simply too sparse to allow for a plausible inference that Bednarik is liable for the misconduct alleged against him.

*See Iqbal*, 556 U.S. at 662 ("A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.").[5]

Aarow also brings claims of tortious interference with contract (Count IX) and tortious interference with business relationships (Count X) against Bednarik. Those torts are described above, and, as with the other claims against Bednarik, Aarow fails to allege facts sufficient to allow for a plausible inference that he is liable for this misconduct.

The Court therefore will grant Bednarik's Motion to Dismiss and all claims against him will be dismissed.

## V.   Veritas' Motion to Dismiss

Newly-added Defendant Veritas also filed a Motion to Dismiss the claims against it. (ECF No. 136.) Veritas argues that Aarow's allegations against it are insufficient to state a claim. The Court agrees and will grant Veritas' Motion to Dismiss.

With respect to Veritas, the Second Amended Complaint alleges that "[u]pon information and belief, the shift in Tricore work also benefitted Veritas. Although Veritas is a separate entity from Tricore and NTI, they maintain a close business relationship along with NTI." (Sec. Am. Compl. ¶ 49; *see also id.* ¶ 50 ("Upon information and belief, once Tricore began performing electrical work, Veritas was able to secure larger projects for itself with Tricore as its subcontractor. With the use of Aarow trade secrets or confidential information, both companies could competitively price bids with the work already completed by Aarow.").) It also alleges that

---

[5] In its prior Memorandum and Order, the Court permitted the conspiracy claim to proceed against certain other Defendants. As the Court explained, Aarow's allegations with respect to those Defendants "plausibly raise[d] an inference that these Defendants are liable." (ECF No. 80 at 20–23.) As the Court noted, those allegations were "somewhat sparse" but did include detail regarding the wrongdoing by the Defendants. (*Id.*) Here, the allegations are even sparser, and the Court cannot make the inferential leap that Aarow asks.

15

"[a]lthough Tricore, NTI, and Veritas are separate legal entities, upon information and belief, they effectively acted as interchangeable parts of a single business. For example, representatives of each entity would jointly participate in preparing bids which would be submitted solely as a bid from NTI, or from Veritas, or from Tricore." (*Id.* ¶ 52.) It further alleges that David Taylor is a part owner of Veritas, in addition to being a part owner of NTI and Tricore. (*Id.* ¶ 12.) Aarow also alleges that Taylor provided feedback on a spreadsheet created by Steele (while Steele was still employed with Aarow) and that the spreadsheet detailed a five-year plan to open a Tricore electrical division with a revenue that would only be possible if Tricore was bringing in existing work. (*Id.* ¶ 60.) Aarow also alleges that Taylor and Steele were communicating in March 2022, while Steele was still employed with Aarow. (*Id.*)

Based upon these factual allegations, Aarow brings claims of aiding and abetting misappropriation of trade secrets in violation of the DTSA (Count III); aiding and abetting misappropriation of trade secrets in violation of the MUTSA (Count IV); aiding and abetting breach of fiduciary duty (Count VI); unfair competition (Count VII); civil conspiracy (Count VIII); and tortious interference with business relationship (Count X).

Similar to the allegations against Bednarik, Aarow has failed to allege sufficient facts for the Court to infer that Veritas is liable for the misconduct alleged.

With respect to Counts III, IV, and VI, the aiding and abetting claims, Veritas may be held liable only if it "by any means (words, signs, or motions) encouraged, incited, aided or abetted the act of the direct perpetrator of the tort." *Alleco, Inc. v. The Harry & Jeanette Weinberg Foundation, Inc.*, 665 A.2d 1038 (Md. 1995). There are no allegations that reflect Veritas aiding or abetting the DTSA, MUTSA, or breach of fiduciary duty counts. Veritas' alleged enjoyment of some benefit from Tricore, NTI, and the other Defendants' allegedly wrongful conduct is

16

insufficient to sustain the claims against it. The allegations against Veritas are deficient, particularly when compared against the allegations against NTI and Tricore. For instance, there are no allegations that conduct was "pervasive" throughout Veritas. *See In re Am. Honda Motor Co. Dealerships Rels. Litig.*, 958 F. Supp. 1045, 1051 n.3 (D. Md. 1997) ("[T]he critical question is whether the illegal conduct alleged was known to and participated in by sufficiently high-level employees within a corporation and/or was sufficiently pervasive within the corporation as to be fairly attributable to the corporation."). Further, the few allegations against Taylor are insufficient to sustain these claims against Veritas.

With respect to Count VII, unfair competition, Aarow has failed to allege that Veritas engaged in "fraud, deceit, trickery or unfair methods of any sort." *Balt. Bedding Corp.*, 34 A.2d at 342. Likewise, Aarow has failed to sufficiently allege Count VIII, civil conspiracy, against Veritas. The allegations against Veritas are far sparser than those leveled against NTI. The Court previously concluded that the conspiracy claim could proceed against NTI, and pointed to the allegations regarding various owners and employees engaging in allegedly wrongful conduct, as well as NTI's provision of supplies to those who were allegedly involved in that conduct. The allegations here are too scant to state a conspiracy claim against Veritas. Further, for the same reasons noted above, Count X will be dismissed.

The Court will therefore dismiss the claims against Veritas.

## VI. Conclusion

For the foregoing reasons, the Original Defendants' Motions to Dismiss (ECF Nos. 111 and 112) will be granted in part and denied in part. They will be granted insofar as they seek the dismissal of Counts V through IX to the extent those counts are based on trade secrets and the

dismissal of Count X.  They are otherwise denied.  Bednarik's Motion to Dismiss (ECF No. 133) will be granted.  Veritas' Motion to Dismiss (ECF No. 136) will also be granted.

DATED this 2 day of April, 2024

BY THE COURT:

/s/ James K. Bredar
James K. Bredar
Chief Judge